## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

TAYLOR QUINN,

                     Plaintiff,

v.                                   CIVIL ACTION NO.   2:21-cv-00421

LT. CHRISTOPHER K. ZERKLE, et al.,

                     Defendants.


MARK TOON, et. al.,

                     Plaintiffs,

v.                                   CIVIL ACTION NO.   2:21-cv-00427

LT. CHRISTOPHER K. ZERKLE, et al.,

                     Defendants.


### MEMORANDUM OPINION AND ORDER

The Court has reviewed *Defendants Sgt. Paxton Lively, Sgt. Rick Keglor, Deputy Brandon Kay and Deputy Jamie Miller's Motion for Summary Judgment* (Document 95), *Defendants Sgt. Paxton Lively, Sgt. Rick Keglor, Deputy Brandon Kay and Deputy Jamie Miller's Memorandum of Law in Support of Their Motion for Summary Judgment* (Document 96), the *Plaintiffs' Response in Opposition to Defendants Sgt. Paxton Lively, Sgt. Rick Keglor, Deputy Brandon Kay, and Deputy Jamie Miller's Motion for Summary Judgment* (Document 102), *Defendants Sgt. Paxton Lively, Sgt. Rick Keglor, Deputy Brandon Kay and Deputy Jamie Miller's Reply to Plaintiffs' Response in Opposition to Their Motion for Summary Judgment* (Document 103), as well as all exhibits.

The Court has also reviewed *Defendant Lt. Christopher K. Zerkle's Motion for Summary Judgment* (Document 97), the *Memorandum in Support of Defendant Lt. Christopher K. Zerkle's Motion for Summary Judgment* (Document 98), the *Plaintiffs' Response in Opposition to Defendant Lt. Christopher Zerkle's Motion for Summary Judgment* (Document 101), *Defendant Lt. Christopher K. Zerkle's Reply to Plaintiff's Response to Defendant Lt. Christopher K. Zerkle's Motion for Summary Judgment* (Document 104), as well as all exhibits.

For the reasons stated herein, the Court finds that both motions for summary judgment should be granted.

## FACTS

The Plaintiffs in this consolidated case are Taylor Quinn and Mark Toon, as personal representative of the Estate of Eric Toon (hereinafter, "Mr. Toon" refers to both Eric Toon and the Estate). The Defendants are Lt. Christopher K. Zerkle, Sgt. Paxton Lively, Sgt. Rick Keglor, Deputy Brandon Kay, and Deputy Jamie Miller. The Defendants were all law enforcement officers involved in a pursuit of Mr. Toon, entry into the residence he shared with Ms. Quinn, and/or the shooting death of Mr. Toon and shooting injury of Ms. Quinn that occurred on August 1, 2019. Lt. Zerkle is a Lieutenant with the West Virginia State Police. Defendants Lively, Keglor, Kay, and Miller (collectively, the Kanawha Deputies) are employed by the Kanawha County Sheriff's Department. Plaintiff Toon alleges the following claims: Count I: 42 U.S.C. § 1983 - Retaliation and Use of Excessive Force in Violation of the 1st Amendment of the United States Constitution, as to Defendant Zerkle; Count II: 42 U.S.C. §1983 - Violation of the 4th Amendment of the United States Constitution: Warrantless Entry and Excessive Force, as to Defendants Kay, Keglor, Lively, Miller, and Zerkle (dismissed as to Defendant Zerkle); Count III:

42 U.S.C. § 1983 - Failure to Intervene in Violation of the 4th Amendment of the United States Constitution, as to Defendants Kay, Keglor, Lively, Miller, and Zerkle; and Count IV: 42 U.S.C. § 1983 - Violation of the 4th Amendment of the United States Constitution: Excessive Force, as to Defendant Zerkle.   Plaintiff Quinn alleges the following claims: Count I: 42 U.S.C. §1983 – Violation of the 4th Amendment of the United States Constitution: Excessive Force, as to Defendant Zerkle; Count II: 42 U.S.C. § 1983 – Violation of the 4th Amendment of the United States Constitution: Warrantless Entry, as to Defendants Lively, Keglor, Kay, and Miller; Count III: Battery, as to Defendant Zerkle; Count IV: Trespass, as to Defendants Lively, Keglor, Kay, and Miller; and Count V: Extreme and Outrageous Conduct; Emotional Distress, as to Defendants Lively, Keglor, Kay, and Miller (dismissed).[1]

This incident began when Lt. Zerkle responded to a report of a domestic violence incident near Falcon Drive and Lotus Drive in Sissonville, West Virginia, in the morning hours on August 1, 2019.   He had observed Eric Toon and a passenger, Noah Sutherland, on a motorcycle in a private lot as he approached the location of the reported domestic violence, although he was unaware of their identities at the time.   He noted that Mr. Sutherland was not wearing a helmet, but the motorcycle was parked, so there was no violation.   While speaking with the individuals involved in the reported domestic altercation, Lt. Zerkle saw the same motorcycle approach.   Mr. Sutherland still was not wearing a helmet.   Lt. Zerkle contends that Mr. Toon lost control and the motorcycle lightly hit the wheel and fender of his cruiser.   In a call to dispatch, he indicated that

---

1 Although the Court granted a motion to dismiss Count V, the parties included briefing arguing for summary judgment as to the Intentional Infliction of Emotional Distress claim.   (Mem. Op., Document 27.)   Because the Court previously dismissed the IIED claim, the Court has omitted any discussion of the parties' arguments and any reasoning as to that claim.

the motorcycle "about" hit his cruiser, and the other individuals present state that the motorcycle did not hit the cruiser.[2]   (Audio from Zerkle call, Document 101-5.)

Mr. Toon, with Mr. Sutherland on the back of the motorcycle wearing no helmet and no shirt, fled when Lt. Zerkle attempted to initiate a traffic stop.   In place of a valid license plate, the motorcycle had a fake plate with the words "Run This" and an extended middle finger, which a dispatcher ran and confirmed to be invalid.   Mr. Toon led Lt. Zerkle on a high-speed chase toward Charleston, across the Patrick Street Bridge, and onto the interstate.   His speed exceeded 100 miles per hour at times, perhaps exceeding 120 miles per hour based on estimates from officers who observed him.   In his initial statement on August 1, 2019, Mr. Sutherland reported being terrified, hanging on to Mr. Toon with his eyes closed for much of the pursuit.

A state police dispatcher, Amber Childers, generated a West Virginia State Police Telecommunicator Pursuit Checklist based on communications with Lt. Zerkle during the pursuit, noting that the pursuit began at 8:54 a.m. on August 1, 2019, and terminated at 8:59 a.m. near the Oakwood Bridge, when Lt. Zerkle indicated he had lost sight of the motorcycle and was terminating due to traffic conditions.   (Pursuit Checklist) (Document 101-5.)   Based on his statements, she noted that the pursuit was part of a domestic call and the suspect almost hit the cruiser.   Ms. Childers also put out a BOLO (be on the lookout) to alert other troopers, and information was relayed to Metro 911 at the same time.

The Metro 911 call notes reflect the radio traffic that officers in agencies outside the state police, including the Charleston Police Department and the Kanawha County Sheriff's

---

2 For purposes of this motion for summary judgment, the Court presumes that Mr. Toon did not hit Lt. Zerkle's cruiser.   However, the information provided to dispatch and, as discussed *infra*, relayed to other officers not present at the time Lt. Zerkle initiated the pursuit, impacts their knowledge, perceptions, and the reasonableness of their actions.

Department, could access.   The Metro call log begins at 8:57 a.m. and indicates that the suspect "is part of domestic; he tried to hit the officer with th[e] car on scene."   (Metro Call No. 538) (Document 101-7.)   At 9:00:18, the Metro radio traffic indicated that the state police were backing off—then about two minutes later, note that Lt. Zerkle was behind the suspect again near the Westmoreland exit.   At 9:08:08, an entry states that Lt. Zerkle "has suspect in sight, not detained." (*Id.*)   The next entries note that the area is being canvassed, the bike is blocked in, and that K-9s are on the scene.   At 9:14:02, the address is provided.   The Metro log does not indicate, at any point, that the pursuit had been terminated.

Lt. Zerkle testified that he terminated the pursuit when he lost sight of the motorcycle, but soon caught up to the motorcycle in an area with roadwork that slowed traffic.   He followed and observed the motorcycle going in the direction of the area where he had first encountered it, so he returned to that area without keeping the motorcycle in sight.   Department of Highways workers motioned him in the right direction at a nearby intersection, and the couple involved in the earlier domestic call told him which house Mr. Toon lived in (without identifying him by name) and that Mr. Toon and Mr. Sutherland had just entered the house.

Security camera footage from the front porch of Mr. Toon and Ms. Quinn's residence shows Mr. Toon and Mr. Sutherland go past on the motorcycle, then run into the house at 9:13:15 a.m.[3]   (Porch video, Def.'s Ex. 4.)   The state police vehicle enters the frame at 9:14:30, immediately followed by another police vehicle.   Officers from the state police, Kanawha County Sheriff's Department, and Charleston Police Department converged on the scene.   Lt. Zerkle and Corporal Charles Whittington of the Charleston Police Department went onto the porch of the

---

[3] The time noted is that reflected on the video.   Exact times may vary between the various sources that include time logs.

residence and knocked on the door.   Receiving no response and finding that the door was secured, they returned to searching the area.   Some officers arriving suggested that the suspect was likely Eric Toon, based on the location and their previous experience with him.

Corporal Jamie Miller of the Kanawha County Sheriff's Office and his K-9 located the motorcycle and helmet and began a track, with assistance from other officers.   That was briefly interrupted when an officer yelled that he saw someone going into the woods, but they were able to return to the track after that proved to be a false alarm.   The K-9 track led toward the front porch and eventually up a ramp to the entrance to the house.   Sgt. Keglor and Sgt. Lively went to the front door to knock and announce.

Meanwhile, inside the residence, Ms. Quinn had been asleep when Mr. Toon and Mr. Sutherland returned.   When she awoke, Mr. Toon had an AR-15, which she testified she was not aware he possessed.[4]   He told her that police had followed them home.   She suggested they pray. They gathered in the bedroom and watched the surveillance footage of officers arriving outside the trailer and knocking on the door.   Ms. Quinn indicated that she and Mr. Sutherland were following Mr. Toon's directions and his lead in determining not to open the door or speak to the officers.   At Mr. Toon's direction, Mr. Sutherland checked that the door was locked, prior to officers stepping onto the porch.   Mr. Toon told them that they would escape on his motorcycle, promising not to leave either of them behind.   She estimated that approximately thirty minutes passed between the time Mr. Toon and Mr. Sutherland returned home and the time officers entered the residence.

---

4 In his deposition, Noah Sutherland stated that he did not see Mr. Toon with the gun until after police had entered the residence.

Sgt. Lively gave a K-9 announcement, consisting of banging on the door or the wall near the door three times, yelling "Kanawha County Sheriff's Office, K-9, come out, call out, or we'll send the dog, and he will bite."   (P. Lively Depo. at 23::5-6) (Document 101-15.)   He repeated the announcement.   Sgt. Lively and the other deputies seeking entry heard movement inside the house after the second announcement, including someone approaching the door.   He began the third announcement, and the door opened.   Lt. Zerkle observed the door opening and called out a warning that it had previously been locked.   The door opened outward, and had a non-standard handle and locking mechanism, which Ms. Quinn testified appeared undamaged after the incident. Ms. Quinn and Mr. Sutherland each testified that neither they nor Mr. Toon had unlocked the door. Although the Kanawha Deputies testified that they believed entry was justified based on a hot pursuit, they had not brought equipment to force entry when they went to the door.   They did not directly observe any criminal offense or any portion of the pursuit but relied entirely on the portions of radio traffic they heard.[5]   Sgt. Keglor, Sgt. Lively, Cpl. Miller, and Deputy Brandon Kay entered after the door opened, with two going in each direction.   The residence was relatively dark, and they used flashlights to see as they cleared rooms for safety.   They did not see anyone inside the residence, although they could hear people.

Lt. Zerkle and Cpl. Whittington went toward the side of the residence to form a perimeter as the Kanawha Deputies entered.   Mr. Toon broke a bedroom window and climbed out, still

---

5 Cpl. Miller testified that he understood that the pursuit was related to a motorcycle hitting Lt. Zerkle, then fleeing. Deputy Kay and Sgt. Keglor each testified that they were unaware of the reason for the pursuit, just that state police had been pursuing a fleeing motorcycle.   Sgt. Lively testified that he believed the pursuit was related to a domestic call but had never discussed the reason for the pursuit with anyone.   All four of the Kanawha Deputy Defendants testified that they believed there was a hot pursuit and were unaware of any termination.   Although some of them spoke briefly with Lt. Zerkle on the scene, there was no discussion of the crime(s) at issue.   Several officers also explained that a pursuit could be terminated due to losing a vehicle in traffic, then quickly restarted when an officer caught sight of the vehicle again.

holding the AR-15.   Ms. Quinn had run into the bathroom when she heard the deputies enter but returned to the bedroom to follow Mr. Toon out the window when she heard the breaking glass. Lt. Zerkle spotted the gun and shouted a warning to Cpl. Whittington.   Mr. Toon landed on the ground and began to rise, assault rifle in hand.   Both officers testified that he pointed the gun at Cpl. Whittington.   Cpl. Whittington's body camera footage is a bit blurry, and events moved quickly, such that it is difficult to determine whether Mr. Toon aimed the gun.   He was clearly facing in Cpl. Whittington's direction while rising into a crouching position, with the gun in his hands.   Both officers fired their weapons, Cpl. Whittington first, quickly followed by Lt. Zerkle. Mr. Toon fell back to the ground.

The officers fired at Mr. Toon as Ms. Quinn was jumping out the window behind him. She was hit in the shoulder and arm.   Mr. Sutherland had put his head out the window, beginning to follow Ms. Quinn, when the shooting occurred, and he remained inside until officers directed him to come out.   Officers quickly converged on the area of the shooting, moving the gun away from Mr. Toon and providing first aid care to Ms. Quinn.   The Kanawha Deputies who had entered the house exited when they heard the gunshots.   Sgt. Lively remained by the front door to hold it open and keep the house secured, while the others went to the area where the shooting occurred.   The Metro 911 log reports shots fired at 9:52 a.m.   Deputy Kay applied a tourniquet to Ms. Quinn's arm.   Officers helped her to an ambulance, and she spent about a week in the hospital.   When officers later cleared the house, they found a bear trap set in the kitchen near the front door, which Ms. Quinn claimed was set up as a joke related to catching a rat due to neighborhood rumors of large rats in the area.   Witnesses and officers were interviewed later that day, both at the scene and elsewhere.

8

**STANDARD OF REVIEW**

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014).   A "material fact" is a fact that could affect the outcome of the case.   *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.   *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23.   When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party.   *Hoschar*, 739 F.3d at 169.   However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor."   *Anderson*, 477 U.S. at 256.   "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action."   *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at

9

*3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

## QUALIFIED IMMUNITY

Both motions for summary judgment assert, in part, that the officers are entitled to qualified immunity. Qualified immunity is an affirmative defense intended to shield public officials from civil suits arising out of their performance of job-related duties. *See, e.g., Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). Defendants asserting a qualified immunity defense first bear the burden of "demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties." *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997) (internal quotation marks omitted.) The defense of qualified immunity is available unless the official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Harlow v. Fitzgerald*, 457 U.S. 800, 815

10

(1982) (internal emphases omitted).   Officials are protected even if they make reasonable mistakes of fact or law, so long as they do not violate a clearly established statutory or constitutional right.   *Pearson*, 555 U.S. at 231–32.   "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."   *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013) (internal quotation marks and citations omitted).

The reasonableness analysis is objective.   Courts must "examine[] only the actions at issue and measure[] them against what a reasonable police officer would do under the circumstances," but the inquiry "must be filtered through the lens of the officer's perceptions at the time of the incident."   *Rowland v. Perry*, 41 F.3d 167, 172-73 (4th Cir. 1994).   "[T]he officer's subjective state of mind is not relevant to the qualified immunity inquiry but his perceptions of the objective facts of the incident in question are."   *Id.* at 173.

## DISCUSSION

### A.   Unlawful Entry

The Kanawha Deputies argue that they are entitled to summary judgment as to the claim that they entered the residence in violation of the Fourth Amendment because they reasonably believed they had consent to enter based on the previously locked door opening as they were knocking and announcing.   Even if their actions did violate the Plaintiffs' Fourth Amendment rights, they contend that such rights were not clearly established, and they are entitled to qualified immunity.   In addition, they argue that they are entitled to qualified immunity based on the hot pursuit exception to the warrant requirement, given the information conveyed to them and the uncertain state of case law on the issue.   They further contend that there is no causal link between

11

their entry and the injuries suffered by the Plaintiffs in the shooting after they fled through a window.  For the same reasons they argue entitle them to summary judgment as to the Fourth Amendment claim, they assert that they are entitled to summary judgment as to Ms. Quinn's trespass claim.  They argue that they did not use force or witness any use of force against Mr. Toon, and so they are entitled to summary judgment as to the excessive use of force and failure to intervene claims.

The Plaintiffs argue that entering the residence without a warrant violated the Fourth Amendment.  They emphasize that whether anyone inside the house unlocked the door or consented to entry is disputed.  They also contend that the hot pursuit exception to the warrant application does not apply because Lt. Zerkle terminated the pursuit prior to reaching the house. Therefore, they argue, there was not a continuous pursuit as required for the exception, and qualified immunity is unavailable because the case law establishing the parameters of the hot pursuit exception is longstanding.  They further argue that their injuries were foreseeable, suggesting that "the conduct of the Defendants, acting in concert with Defendant Zerkle, was sufficient to cause Plaintiff(s) to be in fear for their lives and therefore to attempt to flee the residence where the Defendants were entering in an effort to 'flush' the Plaintiffs from the home." (Pl.s' Resp. at 21) (Document 102.)   In addition, the Plaintiffs argue that the Defendants are not entitled to summary judgment as to the trespass claim because they lacked consent or lawful authority to enter.

In reply, the Kanawha Deputy Defendants argue that they reasonably believed they had implied consent to enter the house when the door opened during the knock and announce and hot pursuit is not necessary "when someone unlocked and opened the door providing a clear invitation

to enter." (Def. Reply at 2) (Document 103.) They contend that "[g]iven that there was a bear trap set up in the unlit kitchen area, it is quite likely that the occupants baited the officers into the residence so that they could attempt flight, which was Eric Toon's plan all along per Taylor Quinn." (*Id.*) They further argue that they are entitled to qualified immunity, given the lack of clearly established law demonstrating that entry based on either consent or hot pursuit would constitute a constitutional violation under these circumstances. In addition, they reiterate their position that their entry did not proximately cause the Plaintiffs' injuries because it was not foreseeable that Mr. Toon and Ms. Quinn would flee or that Mr. Toon would be armed.

Lt. Zerkle also moves for summary judgment as to the failure to intervene claim based on his failure to prevent the Kanawha Deputies from entering the residence, arguing that their entry was constitutional and/or that he had no knowledge of its unconstitutionality based on his reasonable belief that they had consent to enter. The Plaintiffs contend that Lt. Zerkle had acknowledged that there was not a legal basis to enter the residence yet waited near the rear bedroom window for Mr. Toon and Ms. Quinn to jump out rather than acting to prevent the Kanawha Deputies' unlawful entry.

The Fourth Amendment protects people, and their "houses, papers, and effects" against "unreasonable searches or seizures." U.S. Const. amend. IV. "As that text makes clear, 'the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Intrusions into private residences are subject to scrutiny, and "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). The Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into

a suspect's home in order to make a routine felony arrest."  *Id.* at 576.   However, "the warrant requirement is subject to certain exceptions."  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

"[O]ne 'jealously and carefully drawn' exception recognizes the validity of searches with the voluntary consent of an individual possessing authority."  *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (quoting *Jones v. United States,* 357 U.S. 493, 499 (1958)).   "Consent may be inferred from actions as well as words."  *United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003). However, "[t]he government's burden is heavier where consent is not explicit, since consent is not lightly to be inferred."  *United States v. Toyer*, 414 F. App'x 584, 589–90 (4th Cir. 2011) (unpublished).   "The scope of consent for a search is 'objective reasonableness,' or rather, what a reasonable person would have understood from the exchange between the officer and consenting person.  *Id.* at 589 (4th Cir. 2011) (unpublished) (quoting *Florida v. Jimeno,* 500 U.S. 248, 251 (1991)).

The Fourth Circuit found that a pat down was consensual when the officer asked to search the suspect, and "without making an oral response, [the suspect] simply shrugged his shoulders and extended his arms."  *United States v. Wilson*, 895 F.2d 168, 170 (4th Cir. 1990).   In another case, the Fourth Circuit rejected a motion to suppress where police searched a car after a suspect unlocked the car door in response to being asked for permission to search the car, finding implied consent.  *United States v. Smith*, 30 F.3d 568, 570 (4th Cir. 1994).   However, the court found that a person who "partially open[e]d the door to determine the identity of officers knocking on the door," who had not identified themselves, did not consent to the officers' entry when the officers "force[d] their way into [the] hotel room."  *United States v. McCraw*, 920 F.2d 224, 228 (4th Cir.

14

1990).   This District has found that a protective sweep is permissible when police entered a hotel room with consent but had not yet arrested a suspect.   *United States v. Davis*, 588 F. Supp. 2d 693, 703 (S.D. W.Va. 2008) (Johnston, J.).

Other circuits have addressed the specific question of whether entry to a residence may be based on implied consent, with differing results.   *Compare McClish v. Nugent*, 483 F.3d 1231, 1241 (11th Cir. 2007) (quoting *United States v. Gonzalez,* 71 F.3d 819, 830 (11th Cir.1996)) ("we have held that 'whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to sanction *entry* into the home based upon inferred consent'") *with United States v. Lopez-Carillo,* 536 F. App'x 762, 768 (10th Cir. 2013) (unpublished) ("Implied consent to enter a home is no less valid than explicit consent.") *and United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004) (holding that the Fourth Amendment does not require an affirmative invitation or "explicit verbal consent" to enter a dwelling).

As they conducted the K-9 knock and announce at the Plaintiffs' residence following the track, the Kanawha Deputies believed that they were continuing a hot pursuit of a suspect.   The Court finds it unnecessary to determine whether that belief was reasonable under the circumstances.   They did not bring tools to force entry to the door, and the door opened before they had to make a decision about whether and how to gain entry.   Ms. Quinn testified that the door was undamaged, verifying that the officers did not force entry.

Although there are factual disputes regarding what was happening inside the house at the time, there is no material dispute as to the facts as perceived by the officers.   They banged on the door and announced their presence, identifying themselves as law enforcement officers.   The door was locked and secured from the inside when they began their announcement.   After the second

15

K-9 announcement, the door opened.   The door had a handle on the outside without a standard doorknob, and the door opened outward.   Any reasonable officer would presume that the door opened because an occupant of the house opened it in response to their knock and announce. Whether the door was somehow jostled open, opened by the rumored giant rats that Ms. Quinn testified prompted her and Mr. Toon to set a bear trap in their kitchen, or deliberately opened by one of the occupants of the house intending for the officers to enter while they fled through the window, the relevant facts are those perceived by the officers at the time.   They perceived that the previously locked door opened in response to their knock and announce.

A person opening a door would not necessarily constitute consent to enter.   Any citizen might open a door in response to a knock, expecting the person on the other side of the threshold to explain the reason for their visit prior to determining whether to invite them in.   In these circumstances, however, the door swung open without anyone waiting on the other side to limit or specify the scope of their consent to entry or an interaction with the deputies.   Anyone at the door would presume that someone opened the door, then stepped back into the darkened house away from the entrance.

To the extent that there is any doubt about whether the Kanawha Deputies violated the Plaintiffs' Fourth Amendment rights by entering the house when the door opened as they conducted a K-9 knock and announce, they are protected from liability by qualified immunity. The Fourth Circuit has not considered a case with sufficiently analogous facts to definitively determine whether entering a residence when a previously locked door opens in response to officers knocking, but no one comes to the door or interacts directly with the officers in any way,

16

violates the Fourth Amendment.[6]   Thus, the Court finds that any mistake of law was reasonable, because there is no clearly established law to inform officers that opening a door in response to a knock and announce, then stepping away from the entrance, does not constitute implied consent to enter.   Likewise, any mistake of fact was reasonable.   The question does not turn on whether the Plaintiffs actually intended to consent to the Defendants' entry, and so their testimony that no one unlocked the door is irrelevant in the face of the undisputed evidence that the door was locked, then opened as the officers conducted their knock and announce.

Because the undisputed facts would not permit a jury to find that the entry was unconstitutional, the Court finds that the Kanawha Deputies' motion for summary judgment must be granted as to these § 1983 claims.   The claim for trespass rests on the premise that the entry was unlawful.   The Plaintiffs have not presented evidence that would permit such a finding, and so summary judgment is appropriate for that claim as well.   Similarly, the Plaintiffs have not presented evidence that would permit a finding in their favor as to the claim for bystander liability for the unlawful entry as to Lt. Zerkle, given the Court's finding that the entry was not clearly unconstitutional.

---

6 The Supreme Court held that "[c]ourts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"   *Smith v. Ray*, 781 F.3d 95, 106, n. 3 (4th Cir. 2015) (citing *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)). In this case, the Court declines the opportunity to determine whether the door opening is sufficient to provide implied consent.   The determination is not necessary to reach the outcome in this case, and the parties would not have an incentive to fully litigate the issue such that it would become binding precedent for future litigants or future officers facing a similar question.

### B.  Use of Force – Lt. Zerkle

Lt. Zerkle argues that he is entitled to summary judgment on all remaining counts.[7]   He argues that there is no evidence that he intended to shoot Ms. Quinn, and a seizure or use of force must be intentional to establish a claim for excessive force or battery.   Lt. Zerkle next contends that he is entitled to summary judgment as to Mr. Toon's excessive force claim because a reasonable officer, faced with Mr. Toon jumping out of a window armed and brandishing an AR-15 at officers, would have concluded that shooting him was justified—as did the Plaintiffs' own expert.

The Plaintiffs argue Lt. Zerkle is not entitled to qualified immunity because the law surrounding excessive force is well-established, Mr. Toon's suspected crimes were minor, he and Ms. Quinn posed no threat, and they were not actively resisting when officers arrived at the house. They argue that Lt. Zerkle had time to see Ms. Quinn and therefore acted intentionally when he shot her because she testified that she exited the window about thirty seconds after Mr. Toon. They emphasize that Lt. Zerkle's actions in beginning the pursuit and informing other officers that the suspect had hit his cruiser precipitated all of the events that followed, including the Kanawha Deputies' entry into the home.

The Fourth Amendment provides a right to be free from unreasonable seizures, including the use of excessive force.   *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).   "The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force."   *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001).   "In the context of an ongoing police encounter . . . we focus on the moment that the force

---

[7] Mr. Toon concedes that Count I, alleging § 1983 retaliation for First Amendment protected speech, should be dismissed, and so the Court will not address it further.

is employed." *Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 961 F.3d 661, 668 (4th Cir. 2020), *as amended* (June 10, 2020) (internal quotation marks omitted).   Deadly force is not permissible "[w]here the suspect poses no immediate threat to the officer and no threat to others," even if a felony suspect may otherwise flee and escape arrest.   *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).   When an officer reasonably believes that a suspect she is seeking to arrest is reaching for a weapon, the officer is entitled to use deadly force to ensure the safety of herself and others, even if the suspect later turns out to have been unarmed.   *Anderson*, 247 F.3d at 131.   However, officers are not free to shoot any suspect who has a gun.   Where officers approach or enter a house without identifying themselves, and a resident holding a firearm approaches without pointing the gun at the officers or disobeying a command to drop the weapon, the Fourth Circuit has rejected claims of qualified immunity.   *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) (no qualified immunity where officers fired on a man who stood in his doorway holding a shotgun pointed down, where no reasonable officer could have believed the man was aware that they were law enforcement); *Betton v. Belue*, 942 F.3d 184, 192 (4th Cir. 2019) (no qualified immunity where officer forcibly entered home without identifying himself, and shot resident who was holding a firearm pointed down).

The Fourth Circuit has explained, in the context of a qualified immunity defense to excessive force allegations, that "the objective reasonableness of force [should be viewed] in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Rowland*, 41 F.3d at 173–174 (summarizing the facts in that case to state that "it is impossible to escape the conclusion that a man suffered a serious leg injury over a lost five dollar bill," where an officer pursued and tackled a man who had picked up and failed to return a five dollar bill

19

dropped by a woman at a bus station, after the officer ordered him to return the money). Rather than examining a single aspect of an incident in isolation, courts are to evaluate the objective reasonableness based on the totality of circumstances. *Id.*[8] Factors to consider in excessive force cases include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The initial offenses that led Lt. Zerkle to attempt to pull over Mr. Toon were relatively minor traffic infractions. Mr. Toon then led Lt. Zerkle on a dangerous high-speed chase through Charleston and back to his residence. Those facts have some relevance under the *Graham* test, but extensive debate over the reasons for the initial stop, the nature of the pursuit, whether the officers should have obtained a warrant, and any alternatives police could have pursued to deescalate the situation is not fruitful when the officers were faced with a suspect rising toward them with an AR-15 in hand. The Fourth Circuit "has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001). In *Cooper v. Sheehan*, where officers were not entitled to qualified immunity after firing on a man who opened his door with a gun, the Fourth Circuit noted that if the officers had identified themselves "they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat." 735 F.3d 153, 159 (4th Cir. 2013).

---

8 The Fourth Circuit has clarified that not viewing events in isolation means that "the events should [not] be reviewed outside the context of the conduct that precipitated the seizure." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005). However, "the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds," and when the justification for a use of force is eliminated, the use of force must cease. *Id.*

This case is, frankly, not a close call.   Mr. Toon was clearly aware that law enforcement officers were seeking him at his house.   He jumped out of a window with an assault rifle and began to raise it in the direction of Officer Whittington.   It is difficult to imagine an officer who would not feel threatened and respond with deadly force under those circumstances.   The Plaintiff's suggestion in his response brief that "there was no immediate threat to public safety" is not a finding a reasonable juror could adopt based on the undisputed facts.   (Pl.s' Resp. at 15) (Document 101.)   If Mr. Toon had not chosen to arm himself with an AR-15 in preparation for the confrontation he anticipated with law enforcement officers he knew were pursuing him, the Plaintiffs' argument that officers could limit any threat to public safety by preventing him from accessing his motorcycle might carry some weight.   But Lt. Zerkle and Officer Whittington— officers from different departments who did not previously know each other—did not fire on Mr. Toon, essentially simultaneously, to prevent him from further reckless flight on his motorcycle. They fired on him to prevent him from shooting anyone with the assault rifle he carried as he jumped out the window and was in the process of picking up as he rose.   There is no dispute as to any facts material to the determination of whether officers were entitled to use deadly force under these circumstances.   Therefore, the Court finds that Lt. Zerkle's motion for summary judgment as to Mr. Toon's excessive force claim should be granted.   Because Lt. Zerkle's conduct did not violate Mr. Toon's constitutional rights, Mr. Toon cannot demonstrate an essential element of his failure to intervene claim as to the Kanawha Deputies, and their motion for summary judgment must also be granted.

Ms. Quinn, on the other hand, was unarmed and undisputedly posed no threat to officers or anyone else.   Lt. Zerkle argues that she was never seized within the meaning of the Fourth

21

Amendment because she was not the target of the shooting.   The Supreme Court has held that

"the Fourth Amendment addresses misuse of power, not the accidental effects of otherwise lawful

government conduct."   *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989).   Relying on *Brower*,

the Fourth Circuit found that an officer who accidentally shot the driver of a vehicle while firing

at the passenger had not "seized" the driver within the meaning of the Fourth Amendment because

she was not the intended target of the shooting.   *Schultz v. Braga*, 455 F.3d 470, 480 (4th Cir.

2006); *see also Milstead v. Kibler*, 243 F.3d 157, 163–64 (4th Cir. 2001) ("where the seizure is

directed appropriately at the suspect but inadvertently injures an innocent person, the innocent

victim's injury or death is not a seizure that implicates the Fourth Amendment because the means

of the seizure were not deliberately applied to the victim").   Thus, the issue here is whether Ms.

Quinn has presented evidence that would permit a jury to find that Lt. Zerkle intended to shoot

her.

A careful review of the available bodycam video evidence, viewed in the context of the

other evidence, is dispositive on this issue.   Officer Whittington's video provides the only

available view of the shooting, though without sound, while Officer Barnett's bodycam provides

audio of the shooting from an officer who was not within sight.   The audio depicts a cluster of

gunshots, all fired within two seconds.   (Barnett Bodycam at 0:02–0:04, att'd as Def.'s Ex. B)

(Document 106.)   Cpl. Whittington's video depicts him walking around the side of the house.

Eric Toon drops out of a window around the corner of the house with an assault rifle, and lands on

the ground.   (Whittington Bodycam at 0:20, att'd as Def.'s Ex. A) (Document 106.)   Cpl.

Whittington draws his weapon, backing away.   Eric Toon rises onto all fours and starts to pick up

the gun, then drops back to the ground.   (*Id.* at 0:24–0:27.)   The video is shaky as Cpl.

Whittington runs back around the corner of the house, and his gun is visible in his hand in front of his belt-worn camera. (*Id.* at 0:26.) Ms. Quinn then appears, standing upright, in the yard in front of the window, though the window is no longer visible from Cpl. Whittington's position around the corner. (*Id*. at 0:35.) She moves around the yard, then lays on the ground for a few seconds before additional officers arrive. By 1:07 in the video, several officers are in view, securing the scene.

There are simply no facts to support an inference that Lt. Zerkle saw Ms. Quinn exiting the window and intended to shoot her. Even if he had a better view of the window than Cpl. Whittington, the shots were all fired within approximately two seconds, and Ms. Quinn had fully exited the window and gotten to her feet within ten seconds of the shooting. She was shot in the back/shoulder, consistent with her position facing the house as she dropped out of the window. No reasonable juror could find that, in the chaotic seconds of seeing Mr. Toon's weapon, seeing him pick it up and begin to rise, and firing at him, Lt. Zerkle also observed Ms. Quinn exit the window and deliberately aimed at her. Indeed, she testified that she would not have exited the window if the shooting had already begun at that point. There is no evidence that Lt. Zerkle even knew she was present. At the time of the shooting, Lt. Zerkle had not identified Eric Toon, the subject of his pursuit, much less learned that he and Ms. Quinn shared a house. The only reasonable inference from the facts presented is that Ms. Quinn exited the window seconds after Eric Toon and was dropping to the ground behind him at the same time Cpl. Whittington and Lt. Zerkle opened fire. Because she was not an intended target of the shooting, there was no Fourth Amendment seizure. Further, as found above, the decision to use deadly force in response to Mr. Toon's threat was reasonable, and officers are not liable for "the accidental effects of otherwise

23

lawful government conduct." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989).   Therefore, Lt. Zerkle's motion for summary judgment as to Ms. Quinn's excessive force claim must be granted.

West Virginia has adopted the elements of battery set forth in the Restatement (Second) of Torts: "An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." Restatement (Second) of Torts § 13 (1965); *McKenzie v. Sevier*, 854 S.E.2d 236, 245 (W. Va. 2020).   As discussed, there is no evidence that Lt. Zerkle intended any contact with Ms. Quinn when he fired his weapon, and his actions in firing at Mr. Toon were justified. The shooting was justified to prevent the threat Mr. Toon appeared to pose to the officers and others on the scene.   Therefore, Lt. Zerkle is entitled to summary judgment as to the battery claim.

In sum, the Plaintiffs have not produced evidence that would permit a jury to find that the Defendants violated their constitutional rights, either when the Kanawha Deputies entered the home or when Lt. Zerkle shot and killed Mr. Toon and inadvertently shot Ms. Quinn.   The remaining claims cannot survive without evidence supporting those core violations.   Therefore, both motions for summary judgment must be granted in their entirety.

## CONCLUSION

Wherefore, after thorough review and careful consideration, for the reasons stated herein, the Court **ORDERS** that *Defendants Sgt. Paxton Lively, Sgt. Rick Keglor, Deputy Brandon Kay and Deputy Jamie Miller's Motion for Summary Judgment* (Document 95) and *Defendant Lt. Christopher K. Zerkle's Motion for Summary Judgment* (Document 97) be **GRANTED**.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER:     October 26, 2022

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA